# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00956-COA

DONALD "BO" McDILL, A MINOR BY AND
THROUGH HIS MOTHER AND NEXT FRIEND,
TIFFANY McDILL

APPELLANT

v.

SCOTT COUNTY SCHOOL DISTRICT

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/18/2023 |
| TRIAL JUDGE: | HON. CALEB ELIAS MAY |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM T. MAY |
| | RIMEN BRAR SINGH |
| ATTORNEYS FOR APPELLEE: | WILLIAM ROBERT ALLEN |
| | LANCE WESLEY MARTIN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 11/05/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McCARTY AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1. On behalf of her son Donald Bo McDill (Bo), Tiffany McDill (McDill) sued the Scott County School District (the District) for injuries Bo received during a weight-training session at school. The Scott County Circuit Court granted summary judgment in favor of the District, and McDill appeals. Upon review, we find the District was not entitled to immunity and that genuine issues of material fact remain regarding McDill's negligence claims against the District. We therefore reverse the circuit court's order granting summary judgment to the District and remand the case for further proceedings.

# FACTS

¶2.     On January 14, 2019, Bo sustained injuries to his hand and face while participating in a weightlifting session at Sebastopol Attendance Center (SAC) in Scott County, Mississippi.  Bo, who was twelve years old when he was injured, was a member of SAC's seventh- and eighth-grade football team.  Bo testified at his deposition that after his sixth-grade year, he had participated in enough summer workouts to join SAC's football team the following school year.  Bo also testified that during those summer workouts, the football coaches had shown the players the proper form for performing a squat, dead lift, and bench press.

¶3.     Bo testified that on the day of his injuries, he and some football teammates were in SAC's weight room working on a maximum weightlift for their back squats.  To perform a back squat, the teammate attempting the lift had to stand upright with the barbell positioned across his back and shoulders, squat below parallel, and then return to a fully upright position.  Bo stated the players were taking turns and began with a weight they knew they could lift before increasing the weight to ascertain the highest total amount they could successfully lift with at least one repetition of their back squat.  The players were attempting to come close to or potentially exceed their previously recorded maximum weight for the lift.  Following a lifter's back-squat attempt, the players reported their progress to the coaches.  Bo recalled that at least two of the football coaches, Brandon Cutrer and Craig Martin, stood inside the weight room as the players lifted.  The head coach, Nicky Mooney, testified along with the other two coaches that he was also present at the time of Bo's injuries.

¶4. Coach Cutrer and Coach Martin stated that the players were using only one weightlifting rack to perform their back squats. According to Coach Cutrer, any time the players lifted more than eighty percent of their one-repetition maximum weight for a lift, they used three spotters to assist the lifter. The remaining players who were not lifting or spotting stood away from the weightlifting rack to watch and encourage the teammate attempting the lift. Coach Cutrer stated that he was standing about six feet behind the player performing the lift to ensure that the back squat was done correctly.

¶5. Bo testified that at the time of his injuries, he and two other students were acting as spotters to assist another middle-school teammate, who was attempting a 295-pound back squat. The barbell itself weighed 45 pounds, and each side of the barbell contained a total of 125 pounds. To complete the back squat, the lifter had to stand under the weighted barbell as it rested on the squat rack, secure the barbell across his back and shoulders, step away from the weight rack, lower the weight to a squatting position, return to a fully upright position with the weight still secured across his back and shoulders, and then replace the barbell on the squat rack. As one of the spotters positioned at either end of the lifter's barbell, Bo's job was to help stabilize the barbell if the lifter struggled to complete the back squat and return the barbell to its resting position on the squat rack. The spotter positioned behind the lifter was supposed to keep the lifter from falling forward as the weighted barbell rested across the lifter's back and shoulders.

¶6. Coach Mooney and Coach Cutrer corroborated Bo's testimony that the football players began learning about weightlifting during the summer before the football season

3

began. Coach Cutrer stated, however, that the team did not continue to lift weights in the weight room during the football season. All three coaches testified that once the football season ended in October, they resumed instructing the players on weight-room safety before allowing the players to begin lifting any weights. Coach Mooney explained that during the time before the Christmas break, the coaches would "teach the proper way" to lift weights and might even allow the players to incorporate light weights into their lifting. Coach Mooney stated, though, that it was not until after the players returned from their Christmas break that the coaches began to focus more on incorporating weightlifting into the players' training.

¶7. As discussed, the injuries to Bo occurred on January 14, 2019, shortly after the middle-school players returned from Christmas break. According to the deposition testimony of the football coaches, Bo's injuries happened very quickly, and there was insufficient time for the coaches to intervene to prevent the injuries. The undisputed testimony reflected that safety clamps were not being used on the ends of the barbell.[1] The purpose of the safety clamps was to secure the weights in place as the players attempted their back squats.

¶8. As the teammate Bo was spotting attempted to stand up from his back squat, the lifter became off-balance and was unable to return to an upright position, which caused the barbell to tilt toward Bo. As a result, the unsecured weights on Bo's side of the barbell slid off the barbell toward Bo. Bo stated that he put up his hands in an attempt to stop the weights and stabilize the barbell. Bo's efforts proved unsuccessful, though, and his hands were caught

---

[1] The safety clamps were a safety measure added to the barbell after the weights had been placed on each side of the barbell.

under the onslaught of the 125 pounds as the weights slid toward him. The falling weights smashed Bo's finger. In addition, the opposite end of the barbell, which remained weighed down with 125 pounds, caused Bo's now-empty side of the barbell to rapidly bounce back up and strike Bo in the face.

¶9.     Bo testified that the barbell "busted [his] bottom lip and impacted [his] teeth" and "split [his] top gum." In addition, Bo and the coaches all recalled the amount of blood that resulted from the injuries to Bo's face and mouth. Coach Mooney even went so far as to describe Bo's injuries as "the worst accident [he had] ever seen in a weight room." Due to the specific nature of his injuries, Bo had to be taken to a dental office first to have his teeth reset before he could be transported to the hospital for further treatment.

¶10.    According to Coach Mooney, prior to the lift in question the coaches had found it necessary to remind the players who were watching not to distract their teammates who were lifting and spotting. Coach Mooney also testified that although safety clamps were not placed at every weightlifting rack, the clamps were available inside the weight room. When asked why the clamps were not being used as the players performed their back squats, Coach Mooney responded that they were not using the safety clamps to secure the weights on the barbell because they were using the spotters. Upon further questioning, Coach Mooney agreed that the safety clamps could have prevented the barbell from bouncing up and hitting Bo in the face. Coach Martin similarly confirmed that using safety clamps would have prevented the weights from sliding off the side of the barbell. In addition, Coach Martin acknowledged that for the most part, the players performing the back squats would have been

fairly inexperienced weightlifters at that point in their training.

¶11. On November 9, 2020, McDill filed a lawsuit against the District on Bo's behalf. McDill asserted that Bo's injuries were reasonably foreseeable and resulted from numerous negligent acts by SAC's football coaches, which included the failure to ensure the weights were properly equipped and secured with safety clamps, the failure to properly supervise the football players as they lifted the unsecured weights, and the failure to protect Bo from the unsecured and dangerous weights. The District moved for summary judgment. According to the District, it was entitled to discretionary-function immunity under the Mississippi Tort Claims Act (MTCA) because all the weight-room decisions related to McDill's claims involved an element of choice by the football coaches and constituted social and public-policy considerations. Alternatively, the District argued that it was entitled to summary judgment because McDill could not establish that the football coaches acted negligently.

¶12. Following a hearing, the circuit court entered an order on August 18, 2023, finding the allegedly tortious act giving rise to McDill's claims was the football coaches' failure to use safety clamps to prevent the weights from shifting on the barbell. The circuit court held that the "decision to train the student athletes without the use of" safety clamps "involved a level of choice or judgment" by SAC's football coaches. The circuit court also held there was "no evidence specifically showing that weight clamps were required in this situation" presented and that the decision flowed "from the policy[-]making function of the coaches . . . ." Finding that no genuine issue of material fact existed regarding the District's entitlement to discretionary-function immunity under the MTCA, the circuit court granted

summary judgment in favor of the District. Aggrieved, McDill appeals.

## STANDARD OF REVIEW

¶13. "We review the grant or denial of a motion for summary judgment de novo, viewing the evidence in the light most favorable to the party against whom the motion has been made." *Bumpous ex rel. A.B. v. Tishomingo Cnty. Sch. Dist.*, 391 So. 3d 257, 260-61 (¶8) (Miss. Ct. App. 2023) (quoting *Karpinsky v. Am. Nat. Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013)). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "The movant carries the initial burden of persuading the trial court that no genuine issue of material fact exists and judgment as a matter of law is proper." *Clark v. Alfa Ins. Corp.*, 390 So. 3d 1021, 1025 (¶11) (Miss. Ct. App. 2024). "A 'genuine' dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the nonmovant.'" *Robertson v. Houston, Miss. Pub. Sch. Dist.*, 335 So. 3d 1082, 1084 (¶7) (Miss. Ct. App. 2021) (quoting *Wood v. Reynolds*, 316 So. 3d 208, 211 (¶15) (Miss. Ct. App. 2021)).

## DISCUSSION

¶14. To determine if discretionary-function immunity applies to McDill's claims against the District, we apply a two-part public-policy test. *Federinko v. Forrest County*, 381 So. 3d 343, 348 (¶21) (Miss. 2024). First, we "must ascertain whether the activity in question involved an element of choice of judgment, and if so, [we] must also decide whether that

7

choice or judgment involved social, economic, or political-policy considerations." *Id.* (citations and internal quotation marks omitted). "Only when both parts of the test are met does a government defendant enjoy discretionary-function immunity." *Reverie Boutique LLC v. City of Waynesboro*, 282 So. 3d 1273, 1277 (¶27) (Miss. Ct. App. 2019) (quoting *Wilcher v. Lincoln Cnty. Bd. of Supervisors*, 243 So. 3d 177, 187 (¶30) (Miss. 2018)).

¶15.    McDill contends that the allegedly tortious acts giving rise to her claims against the District (i.e., the football coaches' failure to properly secure the weights in SAC's weight room and protect Bo from the dangerous and unsecured weights) stem from their failure to use safety clamps to secure the weights on the barbell during maximum-repetition lifts attempted by the middle-school students.  In response, the District argues that under Mississippi Code Annotated section 37-7-301(q) (Rev. 2019), a school district has discretion not only as to whether it will provide an athletic program but also as to how it will regulate and operate its athletic program.  And according to the District, "[i]f clamps were available[] and the coaches" did not use them to secure the weights in SAC's weight room, such a decision involved an element of choice that "reflect[ed] political[-policy] and social" considerations that fell "well within the coaches' discretionary authority" under the MTCA.

¶16.    We agree with the District that there is an element of choice or judgment involved in the regulation and operation of its overall athletic program.  McDill does not allege, however, that the District's regulation and operation of its athletic program caused Bo's injuries. Rather, her claims arise specifically from the alleged negligence of failing to use safety clamps to secure the weights.  "In applying the discretionary-function exception, [the

8

appellate courts] must distinguish between real policy decisions implicating governmental functions and simple acts of negligence which injure innocent citizens." *Bailey v. City of Pearl*, 282 So. 3d 669, 674 (¶13) (Miss. Ct. App. 2019) (citation and internal quotation marks omitted). After all, "the purpose of discretionary-function immunity is not to protect *all* decisions by governmental employees involving some level of discretion but instead only those functions that by their nature are policy decisions." *Moses v. Rankin County*, 285 So. 3d 620, 623 (¶10) (Miss. 2019) (quoting *Wilcher*, 243 So. 3d at 182 (¶12)). Upon consideration, we discern no real or actual "policy" function that was implicated by the decision of SAC's football coaches to forego the use of admittedly inexpensive and simple safety clamps during their players' maximum weightlifting attempts. Moreover, we find that the claims McDill raises against the District are predicated not on protected policy considerations but on ordinary negligence.

¶17. Essentially, McDill claims that the coaches did not have discretion with regard to the duty of care they owed to Bo. And according to McDill, the football coaches breached their duty not only by failing to exercise ordinary care in supervising the middle-school football players during their weightlifting but also by failing to minimize the foreseeable risks by equipping the players with the proper safety equipment for their maximum weightlifting attempts. *See Bumpous*, 391 So. 3d at 261 (¶11) (recognizing that Mississippi's public schools have a duty to students "to use ordinary care and to take reasonable steps to minimize foreseeable risks"). Viewing the evidence in the light most favorable to McDill, the nonmovant, we find the record contains testimony that raised genuine issues of material fact

9

with regard to McDill's negligence claims against the District. As a result, we reverse the circuit court's grant of summary judgment to the District and remand the matter to allow McDill the opportunity to fully present her negligence claims against the District.

## CONCLUSION

¶18. Because we find that the District was not entitled to discretionary-function immunity and that genuine issues of material fact remain as to McDill's negligence claims, we reverse the circuit court's grant of summary judgment and remand for further proceedings consistent with this opinion.

¶19. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR.**